UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| CEPIA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNIVERSAL PICTURES VISUAL | ) | |
| PROGRAMMING LIMITED, | ) | No. 4:15 CV 1181 JMB |
| | ) | |
| and | ) | |
| | ) | |
| UNIVERSAL PICTURES | ) | |
| INTERNATIONAL ENTERTAINMENT, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

Currently before the Court is Defendants' Motion to Dismiss Plaintiff's Complaint for

Lack of Personal Jurisdiction ("Motion to Dismiss"), pursuant to Fed. R. Civ. P. 12(b)(2).[1]

(ECF No. 10)   Plaintiff filed a Memorandum in Opposition (ECF No. 14) and Defendants filed a

Reply (ECF No. 20).   On December 3, 2015, the Court heard oral argument on the Motion to

Dismiss.   All matters are pending before the undersigned, with the consent of the parties,

pursuant to 28 U.S.C. § 636(c).   The Court concludes that the Motion to Dismiss may be

resolved on the basis of the existing record.   For the reasons outlined below, Defendants' Motion

to Dismiss will be granted.

---

[1] The Court construes the Motion to Dismiss under Rule 12(b)(2), but notes that
Defendants cite to Rule 12(b)(3).

## PROCEDURAL AND FACTUAL BACKGROUND

### I.    General Background

Plaintiff Cepia, LLC ("Cepia") is a limited liability company incorporated under the laws of Missouri, with its principal place of business in St. Louis, Missouri.   Cepia is in the business of developing, manufacturing, and selling innovative toys, including the ZhuZhu Pets Toy Line that inspired the movies, *Quest for Zhu* and *Amazing Adventures of Zhu* ("the Movies").   (ECF No. 1 at Exh. 1 at ¶¶ 2-3)   Defendants in this matter are Universal Pictures Visual Programming Limited ("UPVP") and Universal Pictures International Entertainment ("UPIE") (sometimes collectively referred to herein as "Universals").   Defendants UPVP and UPIE are NBCUniversal business entities; both defendants are foreign corporations with their principal place of business in London, England.   (Id. at ¶¶ 4-5)

Cepia initiated the instant lawsuit on July 31, 2015.   Cepia's Complaint seeks monetary damages and other remedies in connection with a dispute stemming from the marketing and distribution of two animated children's movies produced by Cepia.   In particular, Cepia alleges a breach of contract between UPVP and Cepia (Counts I and II), conversion by Defendants (Count III), and a breach of the implied duty of good faith and fair dealing by UPVP (Count IV).   (ECF No. 1 at ¶ 1)

Cepia alleges diversity jurisdiction, pursuant to 28 U.S.C. § 1332.   Cepia contends that this Court has personal jurisdiction based on Defendants doing business with Cepia in this District and their commission of alleged tortious act(s) that have an effect in this district.   (Id. at ¶ 9)   Cepia argues that "Missouri is designated as the jurisdiction to administer the Distribution Agreement at issue, and the law of Missouri applies to the Distribution Agreement."   (Id.)

On September 15, 2015, Defendants filed the instant Motion to Dismiss, claiming that this case should be dismissed for lack of personal jurisdiction. (ECF No. 10) In response, Cepia asserts that the Court can exercise personal jurisdiction over Defendant UPVP because UPVP entered into a Distribution Agreement and purposefully availed itself of the privilege of conducting business in Missouri.

The Court notes that Cepia's response and Declaration of Laura Kurzu address only Defendant UPVP and the exercise of personal jurisdiction over UPVP; it is silent as to the exercise of personal jurisdiction over Defendant UPIE. During oral argument, the parties' arguments indicated an agreement that UPIE was only tangentially involved in the matter. The record in this case indicates that the Court would have no independent basis to exercise personal jurisdiction over UPIE apart from that which might exist for UPVP. Inasmuch as the Court concludes that it lacks personal jurisdiction over UPVP, it also concludes that it lacks jurisdiction over UPIE. The remainder of this Memorandum and Order focuses on UPVP.

According to Cepia's Complaint, Cepia conceived, developed, and manufactured a children's Toy Line featuring motorized hamsters under the trademark ZhuZhu Pets. (ECF No. 1 at Exh. 1 at ¶¶ 11-13) The Toy Line became a marketplace success, and Cepia heavily promoted the ZhuZhu Pets Toy Line throughout the United States and the United Kingdom. In 2010, Cepia extended distribution of the Toy Line beyond the United States to Europe, Asia, Australia, New Zealand, and North and South America. (Id. at ¶ 16) In addition to expanding its geographic distribution, Cepia extended the Toy Line to include additional creatures and combat hamsters, as well as related play sets and accessories under the Kung Zhu trademark. (Id. at ¶¶ 17-18) The ZhuZhu Pets and Kung Zhu toy lines were part of Cepia's "Zhu-niverse" brand of toys. (Id. at ¶ 19) Cepia also developed Zhu-themed games, music, and videos

showcasing the Zhu worlds and promoting Zhu products and driving Zhu-universe toy sales. (Id. at ¶¶ 21-22) In 2011, Cepia financed and produced the Movies – *Quest for Zhu* and *Amazing Adventures of Zhu* (previously known as *Kung Zhu*). (Id. at ¶ 24; Glassman Aff. at ¶13)

Cepia approached NBCUniversal's Home Entertainment division about marketing and distributing the Movies, and thereafter Cepia's inquiries to UPVP came from agents for Cepia based outside of Missouri including agents located in the United Kingdom. (Glassman Aff. at ¶14) The agents discussed distribution and marketing of the Movies outside the United States and Canada. (Glassman Aff. at ¶¶ 13-14) Cepia and UPVP entered into a Distribution Agreement governing the terms under which UPVP would have the exclusive right to distribute the Movies outside of the United States and Canada. (ECF No. 1 at Exh. A)

UPVP is an NBCUniversal entity. (Glassman Aff. at ¶¶ 4-5) In 2011 and 2012, UPVP's business was primarily media marketing and distribution of films and television shows for home entertainment outside of North America. UPVP does not have any employees or agents in Missouri, does not own any property or bank accounts in Missouri, does not conduct business in Missouri, and is not licensed to do business in Missouri. (Glassman Aff. at ¶¶ 5-7) UPVP does not distribute any media for the home entertainment market in Missouri or order any finished products for distribution. (Id. at ¶¶ 9-10) UPVP did not advertise the Movies in Missouri. (Id. at ¶ 11)

## II.     Distribution Agreement

### A.     Summary of Pertinent Terms

The present dispute arises out of the Distribution Agreement ("the Agreement") between Cepia and UPVP. A copy of the Agreement was filed with the Complaint as Exhibit A. (ECF No. 1-1) The Agreement is one-page in length, signed by representatives of Cepia and UPVP,

and dated "4-21-2011." (Id.) The Agreement is directed only to the distribution of the movies *Quest for Zhu* and *Kung Zhu*, but indicates that other titles would be "discussed in good faith." (Id.) The Agreement grants UPVP certain exclusive distribution rights relative to the two referenced *Zhu* movies. (Id.) In particular, the Agreement grants UPVP "the exclusive right to distribute both Titles on DVD, Blu-ray, 3D Blu-ray, EST, VOD, and TV." These exclusive rights, however, were territorial only and expressly excluded any distribution rights in the United States and Canada. (Id.) By its own terms, the Agreement was to be limited in duration – covering from the date of signing to December 31, 2014, with the intention that distribution would begin in September 2011. (Id.) The Agreement contemplated that "[a] longer form agreement will be negotiated in good faith and until such time this agreement shall be legally binding and shall constitute the entire agreement between the parties and supersede all prior communications and agreements." (Id.)

In the Agreement, UPVP earned a fee based on "a percentage of the gross wholesale revenues received by [UPVP] less all returns ('the Fee')." Id. Cepia bore most of the costs of manufacturing, distribution, and marketing. Id.

In the Agreement, Cepia retained most, if not all, approval rights. For example, The Agreement included the following Marketing and Approvals provisions:

> **Marketing:** Cepia intends to spend a minimum of 15%-20% of forecasted revenues on marketing in each territory and for each Title in its first 16 weeks of release. [UPVP] to recommend a marketing plan for each territory and Cepia to have final approval over such marketing plans. [UPVP] to execute such marketing plans, after Cepia's approval.

> **Approvals:** a. In all territories Cepia will have final approval over all dubbing and marketing costs; [UPVP] will propose costs to Cepia in advance and Cepia will give pre-approval per its discretion. b. [UPVP] will advise Cepia on how best to market and package the movies; Cepia will have final approval over all marketing and packaging.

(Id.)

Pursuant to an Accounting and Reporting provision, UPVP was required to "report to Cepia 90 days after the end of each quarter, such report will indicate sales, returns, costs, fees, etc. for the quarter and will be accompanied by payment."   (Id.)   The provision did not specifically direct where such payment would be made.

Finally, the Agreement includes a "Jurisdiction" clause stating that the "deal will be administered under the Laws of the State of Missouri."   This provision is a choice of law provision and is sometimes referred to in this matter as the "Laws Clause."   (Id.)

###   B.     Overview of Contract Formation and Alleged Breach

The record before the Court indicates that the Agreement was formed and performed by UPVP outside of Missouri.   Cepia's Agents discussed with UPVP the distribution and marketing of the Movies outside of North America.   (Glassman Aff. at ¶ 14)   In the course of negotiating the terms of the international distribution agreement, the parties exchanged draft revisions, e-mails, and phone calls.   (Kurzu Dec'l at ¶ 2; Glassman Aff. at ¶¶ 12, 18)   No agent or employee of UPVP traveled to Missouri to meet with Cepia personnel.   (Glassman Aff. at ¶ 8) In contrast, Cepia sent several employees and agents to England in connection with the Agreement.   These included the CEO, marketing director, a consultant, and an attorney.   (Id. at ¶¶ 22-24)

Cepia drafted an initial deal memorandum that contained the Laws Clause.   (ECF No. 1 at Exh. A)   UPVP never made any revisions to that provision.   (Glassman Aff. at ¶ 17)   Cepia transmitted the initial draft of the deal memorandum to UPVP.   (Glassman Aff. at ¶ 17)   On April 15, 2011, Cepia signed the Agreement and forwarded the Agreement to UPVP for its signature.   (Kurzu Dec'l at ¶ 2, Glassman Aff. at ¶ 19)   On April 21, 2011, UPVP countersigned

the Agreement.  (Id.)  UPIE is not a party to the Agreement.  (ECF No. 1 at Exh. A)

Cepia filed the present lawsuit after it discovered that UPVP had allegedly distributed the *Amazing Adventures of Zhu* (previously known as "*Kung Zhu*") to television networks in Brazil and France without Cepia's knowledge or approval.  (ECF No. 1 at ¶ 53; ECF No. 14 at 3) Broadly speaking, Cepia alleges that UPVP's marketing plans for *Amazing Adventures of Zhu* were unacceptable.  (ECF No. 1 at ¶¶ 39-50)  Count I of the Complaint alleges a breach of the Agreement as a result of UPVP's unauthorized distribution of *Amazing Adventures of Zhu*. Count II alleges that UPVP breached the Agreement by failing to pay revenues owed to Cepia. Count III alleges a cause of action for conversion relative to the movie *Amazing Adventures of Zhu*.  Count IV alleges cause of action for breach of the implied duty of good faith and fair dealing relative to the Agreement.

### C.  Course of Dealings and Distribution – *Quest for Zhu*

In April 2011, Laura Kurzu, Cepia's marketing director, traveled to London and attended Universals' annual conference and made a presentation about the Movies.  (Glassman Aff. at ¶ 22)  Beginning in April 2011, Cepia personnel in St. Louis and UPVP personnel in London had conference calls to discuss the marketing and distribution of *Quest for Zhu*.  (Kurzu Dec'l at ¶ 3) UPVP e-mailed its first forecast and marketing plan to Cepia employees, and thereafter, UPVP personnel conducted a video conference with Cepia personnel in St. Louis to discuss the marketing and distribution of *Quest for Zhu* in the summer of 2011.  (Id. at ¶ 4)  UPVP personnel had other video conferences with Cepia personnel in St. Louis to discuss the marketing and distribution of *Quest for Zhu*, and telephone calls to discuss anticipated dubbing and marketing costs, approval of such costs, and graphics and packaging details.  (Id. at ¶¶ 4-5, 8) UPVP personnel sent multiple e-mail requests to Cepia employees in St. Louis seeking approval

of dubbing and marketing costs and DVD and Blu-Ray graphics and packaging details stemming from UPVP's distribution of *Quest for Zhu*. (Id. at ¶¶ 5, 8) UPVP personnel in London and Cepia employees in St. Louis exchanged e-mails discussing UPVP's international press release to be used to market the Movies. (Id. at ¶ 10)

Chris Mouser, a Cepia employee in St. Louis, set up an FTP site so that UPVP could share documents, videos, and information with Cepia employees in St. Louis. (Id at ¶ 6)

UPVP sent finished DVD and Blu-Ray product samples of *Quest for Zhu* to Cepia in St. Louis at Cepia's request. (Id. at ¶ 9; Glassman Second Aff. at ¶ 5)

UPVP made quarterly payments to Cepia's U.S. Bank account starting on September 30, 2011. (Id. at ¶ 7) UPVP made quarterly payments on September 30, 2011 in the amount of $197,473, on December 31, 2011 in the amount of $462, 904, on March 31, 2012 in the amount of $146,546, on December 31, 2013 in the amount $93,433, on March 31, 2014 in the amount of $155,460, and on June 30, 2014 in the amount of $134,936. (ECF No. 14 at Exh. A)

### D.     <u>Course of Dealings and Distribution – *Amazing Adventures of Zhu*</u>

Russell Hornsby, Cepia's CEO, met and discussed UPVP's marketing plan and distribution of *Amazing Adventures of Zhu* with UPVP in London in May 2012. Phillip Kaplan, Cepia's St. Louis-based outside counsel, also attended this meeting. (Glassman Aff. at ¶ 24) As noted above, Cepia contends that UPVP distributed *Amazing Adventures of Zhu* to television broadcasters in Brazil and France without Cepia's knowledge or approval. (ECF No. 1 at ¶ 8) As a result if this alleged conduct, Cepia claims it has been harmed. (Id. at ¶¶ 55-62) There is no allegation that UPVP distributed *Amazing Adventures of Zhu* to any outlet in the United States.

### III.    Summary of Parties' Arguments

UPVP argues that the Court lacks personal jurisdiction over it because Cepia's conduct does not fall within the scope of Missouri's long-arm statute, and because exercising such jurisdiction would not comport with due process.   More specifically, UPVP argues that, despite the parties' interactions in terms of negotiating and performing the Agreement, the performance of the contract and the distribution of the Movies occurred entirely outside of Missouri.   Further, UPVP asserts that it did not conduct any business in Missouri, and all revenue was earned outside of Missouri where the Movies were marketed and distributed.   UPVP also contends that the choice of law provision in the Agreement is insufficient to support the exercise of personal jurisdiction in Missouri.

In opposition to Defendants' Motion to Dismiss, Cepia argues that UPVP is subject to personal jurisdiction in Missouri because UPVP voluntarily pursued an ongoing business relationship with a Missouri company to distribute Cepia's Movies, made substantial payments to a Missouri company, exchanged phone calls and e-mails with Cepia in Missouri, submitted sales forecasts and marketing plans to Cepia in Missouri for its approval, attended online meetings with Cepia employees, and shipped product samples to Cepia in Missouri.   Cepia claims that the nature and the quality of Defendants' contacts in the State of Missouri, as well as the quantity of those contacts, support the Court's exercise of personal jurisdiction in this matter.   Cepia also relies on the choice of law provision in the Agreement.   That provision requires the parties to apply Missouri law.   According to Cepia, the inclusion of the Missouri choice of law provides supports the exercise of personal jurisdiction over UPVP.   Cepia contends that Missouri is the only logical place to litigate the present dispute.

To defeat a motion to dismiss for lack of personal jurisdiction, "the nonmoving party need[] only make a prima facie showing of jurisdiction." Miller v. Nippon Carbon Co., Ltd. 528 F.3d 1087, 1090 (8th Cir. 2008). This requires "a plaintiff [to] state sufficient facts in the complaint to support a reasonable inference that the defendant[] can be subjected to jurisdiction within the state." Dairy Farmers of America, Inc. v. Bassett & Walker Int'l, Inc., 702 F.3d 472, 474 (8th Cir. 2012) (internal quotation omitted). "The plaintiff's prima facie showing must be tested, not by the pleadings alone, but by the affidavits and exhibits presented with the motion[] and in opposition thereto." Dever v. Hentzen Coatings, Inc., 380 F.3d 1070, 1072 (8th Cir. 2004) (citation and internal quotations omitted). Cepia has the burden of proving facts supporting personal jurisdiction. Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG, 646 F.3d 589, 592 (8th Cir. 2011). Where, as here, the Court does not hold a pretrial evidentiary hearing on the issue of personal jurisdiction, the plaintiff need only make a prima facie showing of jurisdiction based on the pleadings, affidavits, and exhibits. Miller, 528 F.3d at 1090. "For purposes of a prima facie showing, the court must view the evidence in the light most favorable to the plaintiff and resolve all factual conflicts in the plaintiff's favor." Digi-Tel Holdings, Inc. v. Proteq Telecom., LTD., 89 F.3d 519, 522 (8th Cir. 1996) (citation omitted).

"Personal jurisdiction can be specific or general." Viasystems, 646 F.3d at 593. In this case, there is no contention that any defendant is subject to general jurisdiction in Missouri.[2]

---

[2] General jurisdiction requires that a defendant has "continuous and systematic" contacts with the forum State so as "to render [the defendant] essentially at home in the forum state." Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846, 2851 (2011) (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 317 (1945) (internal quotations omitted). See also Pangeae, Inc. v. Flying Burrito, LLC, 647 F.3d 741, 745-46 (8th Cir. 2011) ("Specific jurisdiction may be conferred over causes of action arising from or related to a defendant's actions within the forum state.") (citations omitted).

Therefore, the Court will focus on the question of specific jurisdiction. "Specific personal jurisdiction can be exercised by a federal court in a diversity suit only if authorized by the forum state's long-arm statute <u>and</u> permitted by the Due Process Clause of the Fourteenth Amendment." <u>Id.</u> (emphasis supplied).

## I.      Missouri Long-Arm Statute

Although Missouri's "long-arm statute extends jurisdiction to the limits of the Due Process Clause, it does so only for acts within its enumerated categories. The Missouri Supreme Court has held that the legislature intended the long-arm statute 'to provide for jurisdiction, within the specific categories enumerated in the statutes, to the full extent permitted by the due process clause of the Fourteenth Amendment.'" <u>Dairy Farmers</u>, 702 F.3d at 475 (quoting <u>State ex rel. Metal Serv. Ctr. of Ga., Inc. v. Gaertner</u>, 677 S.W.2d 325, 327 (Mo. 1984) (en banc)). <u>See</u> <u>also</u> <u>Scullin Steel Co. v. Nat'l Ry. Utilization Corp.</u>, 676 F.2d 309, 311-12 (8th Cir. 1982).

The Missouri Long-Arm Statute provides in relevant part:

> Any person or firm, whether or not a citizen or resident of this state, or any corporation, who in person or through an agent does any of the acts enumerated in this section, thereby submits such person, firm, or corporation, and, if an individual, his personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any such acts:
>
> (1) The transaction of any business within this state;
> (2) The making of any contract within this state; [and]
> (3) The commission of a tortious act within this state….

Mo. Rev. Stat. Section 506.500(1, 2, 3).[3]

_____

[3]  The Missouri long-arm statute includes other prongs for conduct that could not possibly be at issue in this matter, including real property ownership/use in Missouri, providing insurance in Missouri, and certain paternity matters.

## II.    Due Process

Even if personal jurisdiction over a defendant is authorized by the forum's state's long arm statute, the Constitution poses limits on a State's exercise of personal jurisdiction over non-resident defendants under the Due Process Clause.    See Walden v. Fiore, 134 S. Ct. 1115, 1121 (2014); World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291-92 (1980).   The analysis under the Due Process Clause requires "minimum contacts" between the nonresident defendant and the forum state such that "maintenance of the suit does not offend traditional notions of fair play and substantial justice."   Id. at 292 (internal quotations omitted).   Sufficient contacts exist when "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there."   Id. at 297.   The defendant must have "purposefully avail[ed] itself of the privilege of conducting activities within the forum [s]tate," thus invoking the benefits and protections of the state's laws.   Id.; see also Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985); Johnson v. Arden, 614 F.3d 785, 794 (8th Cir. 2010) (due process requires that a defendant purposefully direct its activities at the forum state in a suit that "arises out of" or "relates to" these activities in order to be subject to personal jurisdiction in the forum).

The foregoing principles are discussed in greater detail in the analysis below.

Whether considered under Missouri's long-arm statute, or the Due Process Clause, the undersigned concludes that the Court may not exercise specific personal jurisdiction over UPVP in this matter.

## I.      Missouri Long-Arm Statute

As indicated above, pursuant to the Missouri long-arm statute, this Court may exercise personal jurisdiction over UPVP if Cepia shows that the case falls within at least one of three categories:   (1) the transaction of business within the state; (2) the making of a contract within the state; or (3) the commission of a tortious act within the state.   See Mo. Rev. Stat. § 506.500. See also Dairy Farmers, 702 F.3d at 475 (explaining that, although Missouri's long-arm statute reaches the limits of due process, it does so only within the specific categories enumerated in that statute).   In its opposition to Defendant's Motion to Dismiss, Plaintiff did not specifically address the applicability of the Missouri long-arm categories, but it briefly addressed the issue during oral argument when requested by the Court.   The Court addresses each category below.

### A.      Transacting Business within Missouri

For UPVP to have transacted business within Missouri under the long-arm statute, UPVP must have conducted "some activity, directly or indirectly related to the transaction in question" in Missouri; and that activity must then give rise to the cause of action asserted in this case. Scullin Steel, 676 F.2d at 312.

The evidence before the Court shows that UPVP did not transact any business in Missouri within the meaning of the long-arm statute.   The record shows that Cepia approached UPVP regarding the distribution and marketing of the Movies outside the United States.   UPVP did not reach out and initiate business within the State of Missouri.   See Burger King Corp., 471 U.S. at 473 ("with respect to interstate contractual obligations, we have emphasized that parties who

'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to" personal jurisdiction). The Agreement covered the international distribution via "DVD, Blu-ray, 3D Blu-ray, EST [Electronic Sell Through], VOD and TV" of the Movies Cepia financed and produced before the parties entered the Agreement.

Here, there is no indication at all that UPVP had offices, property, personnel, or any agents in Missouri. Cepia solicited the business relationship with UPVP in England. The Agreement contemplated UPVP's efforts in markets outside of the United States. UPVP sent no products to Missouri for distribution. No face-to-face meetings occurred in Missouri. See Dairy Farmers, 702 F.3d at 476.

The case is analogous to Scullin Steel. In that case, a Missouri plaintiff contracted to sell steel castings to a Pennsylvania defendant. While the plaintiff visited Pennsylvania to negotiate the contract, none of the defendant's personnel ever visited Missouri in connection with the contract. The defendant was not authorized to do business in Missouri, owned no property in Missouri, and had no agents in Missouri. The parties exchanged mail and routine telephone communications as part of their dealings. The parties' contract was amended several times. All manufacturing was performed in Missouri, with delivery in Missouri and payments from the defendant to Missouri. At some point, the defendant refused to pay, resulting in the plaintiff suing the defendant in the Eastern District of Missouri on the basis of diversity jurisdiction. See Scullin Steel, 676 F.2d at 310. The Eighth Circuit observed that the "transacting business" requirement should be liberally construed. Id. at 312. Yet that Court also found that the defendant's activities in the case were not sufficient to satisfy the long-arm statute's "requirement of 'transacting any business' within Missouri." Id.

When compared to the facts of Scullin Steel, the undersigned concludes that

UPVP's communications with Cepia by phone, e-mail, and video conference, and the transmission of payments to U.S. Bank on behalf of Cepia, do not satisfy the transaction of business requirement. Under the Agreement, UPVP's efforts focused on marketing and distribution of the Movies exclusively outside of Missouri and the United States, only samples were provided by UPVP to Cepia. UPVP did not transact business in Missouri and therefore is not within the reach of Missouri's long-arm statute under the "transacting business" section.

Even if one were to conclude that UPVP's conduct amounted to "transacting business" in Missouri, the exercise of personal jurisdiction over UPVP in this case would not comport with due process considerations, as more fully discussed below.

B.      **Making a Contract in Missouri**

The facts before the Court also indicate that personal jurisdiction over UPVP cannot be found within the "making of a contract" section of the long-arm statute. Under Missouri law, "for purposes of the long-arm statute, a contract is made where acceptance occurs." Strobehn v. Mason, 397 S.W.3d 487, 498 (Mo. Ct. App. 2013).

Cepia prepared and signed the Agreement before sending it to UPVP in England for execution by UPVP. UPVP signed the Agreement in England. For long-arm purposes, contract acceptance occurred in England, not Missouri. No contract was made in Missouri. Therefore, the contract section of the Missouri long-arm statute cannot serve as a basis for the exercise of personal jurisdiction over UPVP.

C.      **Commission of a Tortious Act within Missouri**

"A party relying on a defendant's commission of a tort within [Missouri] to invoke long arm jurisdiction must make a prima facie showing of the validity of [its] claim." State ex rel. William Ranni Assoc., Inc. v. Hartenbach, 742 S.W.2d 134, 139 (Mo. 1987). Although the

long-arm statute nominally contemplates tortious acts occurring within the State, Missouri courts have interpreted the tortious acts prong to cover "extraterritorial acts of negligence producing actionable consequences in Missouri." <u>Id.</u> at 139. Missouri courts have varied with respect to the type of conduct that may be used to produce "actionable consequences." <u>See</u> <u>Noble v. Shawnee Gun Shop, Inc.</u>, 316 S.W.3d 364, 371 (Mo. App. W.D. 2010) (discussing cases). In some cases, Missouri courts have held that "the defendant must have set in motion some course of action which was deliberately designed to move into Missouri and injure the plaintiff." <u>Capitol Indem. Corp. v. Citizens Nat. Bank</u>, 8 S.W.3d 893, 903 (Mo. App. W.D. 2000) (citation omitted). Other cases have not required that the consequences be intentionally directed at Missouri. <u>See</u> <u>Noble</u>, 316 S.W.3d at 371 (citing cases). It appears that, under Missouri law, the less stringent standard applies in negligence matters and the more stringent/deliberate design standard applies with respect to intentional torts. <u>See</u> <u>id.</u> <u>See also</u> <u>Myers v. Casino Queen, Inc.</u>, 689 F.3d 904, 911 (8th Cir. 2012) (applying a foreseeability standard to tortious acts occurring in another state with actionable consequences in Missouri).

In its Complaint, Cepia alleges that Defendants committed tortious acts having an effect in this District. (ECF No. 1 at ¶ 9) Count III of the Complaint specifically alleges an intentional tort under Missouri tort law, namely that UPVP "misappropriated and converted *Amazing Adventures of Zhu,* to the exclusion of Cepia's interests and rights in the movie" by distributing the movie to television networks in Brazil and France without Cepia's authorization. (<u>Id.</u> at ¶ 86)

"Conversion is the unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's rights." <u>Emerick v. Mutual Ben. Life Ins. Co.</u>, 756 S.W.2d 513, 523 (Mo. 1988) (citing <u>Maples v. United Savings and Loan Assoc.</u>, 686

S.W.2d 525, 527 (Mo. App. 1985)). Conversion has three elements. First, Cepia must show it was the owner of the property in question, in this case the movie *Amazing Adventures of Zhu*. Second, Cepia must show that UPVP wrongfully appropriated the movie *Amazing Adventures of Zhu* with the intent to exercise some control over it. Third, Cepia must show that UPVP deprived Cepia of its right of possession of the movie *Amazing Adventures of Zhu*. See Missouri App'd Jury Inst. 7th Ed. at § 23.12(1). Under Missouri law, however, "a cause of action in conversion does not lie 'for money represented by a general debt.'" Capitol Indem. Corp., 8 S.W.3d at 900 (quoting Dillard v. Payne, 615 S.W.2d 53, 55 (Mo. 1981)).

In this case, there is a question whether Cepia's Complaint sufficiently states a prima facie case of conversion. Although the Complaint alleges that UPVP deprived Cepia of its "absolute right of ownership and possession" of the *Amazing Adventures of Zhu* movie (see, e.g., ECF No. 1 at ¶ 90), the focus of Count III appears to rest on UPVP's refusal to account for revenue generated by the unauthorized distribution of the *Amazing Adventures of Zhu* movie (see, e.g., id. at ¶¶ 91-92).[4] Moreover, Cepia retained at least some, if not most, of its possessory rights over the *Adventures of Zhu* movie, despite UPVP's alleged unauthorized distribution. If that is correct, then Cepia has failed to state a cause of action for conversion under Missouri law because Count III is actually a claim for money representing a general debt and not a claim of conversion. See Capitol Indem. Corp., 8 S.W.3d at 900.

In any event, assuming that Cepia has stated a valid cause of action for conversion, it has not satisfied the Missouri long-arm statute. Conversion is an intentional tort. In this case,

---

[4] As noted above, Cepia's response to the Motion to Dismiss focused primarily on the minimum contacts / Due Process standard, and not the Missouri long-arm statute. Thus, there was no briefing in this matter as to whether an action for conversion is appropriate for intellectual property such as the movie at issue herein. Plaintiff was not deprived of all use of the movie as would be the case of conversion of a more traditional/tangible item of personal property.

Cepia alleges conversion based on UPVP's unauthorized distribution of a movie to broadcasters located in Brazil and France.   Thus, Cepia has not shown that UPVP "set in motion some course of action which was <u>deliberately designed</u> to move into Missouri and injure [Cepia]."   <u>See Capitol Indem. Corp.</u>, 8 S.W.3d at 903 (emphasis supplied).

Moreover, even assuming that Cepia's Complaint alleges a prima facie case of conversion under Missouri law, and further assuming UPVP's tortious conduct resulted in actionable consequences in Missouri, the Court cannot exercise personal jurisdiction over UPVP because such exercise would not comport with the Due Process Clause of the Fourteenth Amendment.

**II.       <u>Due Process / Minimum Contacts Analysis</u>**

Even if a plaintiff satisfies the forum's long-arm statute, a federal court may exercise diversity jurisdiction over a nonresident defendant only if the defendant has sufficient minimum contacts with the forum that "maintenance of the suit does not offend traditional notions of fair play and substantial justice."   <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945) (internal quotation marks and quoted case omitted).   <u>See also</u> <u>Walden v. Fiore</u>, 134 S. Ct. 1115, 1121 (2014) (citing <u>World-Wide Volkswagen</u>, 444 U.S. at 291); <u>Fastpath, Inc. v. Arbela Technologies Corp.</u>, 760 F.3d 816, 820 (8th Cir. 2014); <u>Viasystems</u>, 646 F.3d at 594.   "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."   <u>Hanson v. Denckla</u>, 357 U.S. 235, 253 (1958).   Due process is satisfied and jurisdiction may be exercised when a non-resident defendant's contacts with the forum state are sufficient so that it "should reasonably anticipate being haled into court there."   <u>Fastpath</u>, 760 F.3d at 820-21 (citing <u>World-Wide Volkswagen</u>, 444 U.S. at 297).

"The 'purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as the result of random, fortuitous, or attenuated contacts or of the unilateral activity of another party of some third person.'" Id. at 821 (quoting Stanton v. St. Jude Med., Inc., 340 F.3d 690, 693-94 (8th Cir. 2003)). "For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." Walden, 134 S. Ct. at 1121. See also Fastpath, 760 F.3d at 821 (quoting same).

The Eighth Circuit has "established a five-factor test to determine the sufficiency of a non-resident defendant's contacts with the forum state." Fastpath, 760 F.3d at 821 (citing Dever v. Hentzen Coatings, 380 F.3d 1070, 1073 (8th Cir. 2004)).

> The five factors are: 1) the nature and quality of contacts with the forum state; 2) the quantity of the contacts; 3) the relation of the cause of action to the contacts; 4) the interest of the forum state in providing a forum for its residents; and 5) convenience of the parties….

Id. (citing Dever, 380 F.3d at 1073-74). "Although 'the first three factors are primary factors, and the remaining two are secondary factors,' we look at all of the factors and the totality of the circumstances in deciding whether personal jurisdiction exists." K-V Pharm. Co. v. J. Uriach & CIA, S.A., 648 F.3d 588, 592-93 (8th Cir. 2011) (quoting Johnson v. Arden, 614 F.3d 785, 794 (8th Cir. 2010)).

The present case involves both contract and tort claims. Thus, before addressing the five factors specifically, it is useful to consider the role that contracts and torts play in a court's personal jurisdiction analysis. See Fastpath, 760 F.3d at 821 (citing K-V Pharm., 648 F.3d at 583). "'A contract between a plaintiff and an out-of-state defendant is not sufficient in and of itself to establish personal jurisdiction over the defendant in the plaintiff's forum state.'" Id. (quoting K-V Pharm., 648 F.3d at 583). Courts should not apply mechanical tests based only on the place of contracting or performance. "Instead courts should consider the terms of the

contract and its contemplated future consequences in determining whether personal jurisdiction over a non-resident defendant exists." Id. (citations omitted).

Minimum contacts principles likewise "apply when intentional torts are involved." See Walden, 134 S. Ct. at 1123. In Walden, the Supreme Court explained that

> [i]n [the intentional tort context], it is likewise insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff…. A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum.

Id. (internal quotations omitted). The Supreme Court further noted that the due process minimum contacts analysis must focus on "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." Id. at 1122. Similarly, the Eighth Circuit has held that

> [d]ue process allows a state to assert personal jurisdiction over a defendant based on the in-state effects of defendants' extraterritorial tortious acts only if those acts "(1) were intentional, (2) were uniquely or expressly aimed at the forum, and (3) caused harm, the brunt of which was suffered—and which the defendant knew was likely to be suffered—[in the forum state]."

Viasystems, 646 F.3d at 594 (emphasis supplied) (quoting Johnson, 614 F.3d at 796). See also Calder v. Jones, 465 U.S. 783 (1984).

With these principles in mind, and in consideration of the totality of the circumstances, the Court concludes that Cepia has not shown that UPVP had sufficient minimum contact with Missouri to permit the exercise of personal jurisdiction. UPVP's contacts with Missouri were sporadic, random, and fortuitous. To the extent Cepia has made a prima facia showing that UPVP's extraterritorial conduct was tortious, and Cepia felt some of the effects in Missouri, Cepia has not shown that UPVP's allegedly tortious conduct was uniquely or expressly aimed at Missouri. See Steinbach v. Cutler, 518 F.3d 580, 586 (8th Cir. 2008) ("Specific jurisdiction …

is appropriate only if the injury giving rise to the lawsuit occurred within or had some connection to the forum state, meaning that the defendant purposely directed its activities at the forum state and the claim arose out of or relates to those activities.").

## A.  Consideration of Pertinent and Analogous Precedent

A consideration of the Eighth Circuit's prior decisions in several similar cases is useful with respect to an analysis of the three primary factors for assessing UPVP's contacts with Missouri.

### 1.  Scullin Steel Co. v. National Railway Utilization Corp., 676 F.2d 309 (8th Cir. 1982)

As noted above, in Scullin Steel, a Missouri plaintiff contracted to sell steel castings to a Pennsylvania defendant.  See 676 F.2d at 310.  The Eighth Circuit found that the defendant's conduct did not equate to transacting business within the meaning of Missouri's long-arm statute, even if that provision is liberally construed.  Id. at 312.  The Court further concluded that the defendant lacked sufficient minimum contacts with Missouri to exercise personal jurisdiction. Id. at 313.  The fact that the plaintiff's performance under the contract occurred largely in Missouri was not material.  Id. ("It is a defendant's contacts with the forum state that are of interest in determining if in personam jurisdiction exists, not its contacts with a resident.") (citation omitted).  The Court found the exchange of phone calls and the use of the mail (which were substantial) and payments insufficient to satisfy the minimum contacts standard.  Id. at 314 ("The use of interstate facilities (telephone, the mail), the making of payments in the forum state, and the provision for delivery within the forum state are secondary or ancillary factors and cannot alone provide the 'minimum contacts' required by due process.").  Id.  (citations omitted).

### 2.  Fastpath, Inc. v. Arbela Technologies Corp., 760 F.3d 816 (8th Cir. 2014)

The Eighth Circuit's recent decision in Fastpath is also instructive. In that case, the plaintiff, an Iowa company, entered into a mutual confidentiality and covenant not to compete agreement with a California-based company. The purpose of the agreement was in anticipation of future business together. Id. at 819. The defendant initiated contact with the plaintiff, with negotiations occurring largely via conference calls and e-mail. Id. The parties included a choice-of-law provision indicating that Iowa law would control. Id. The plaintiff sued the defendant in Iowa, claiming a breach of the covenant not to compete. The defendant successfully moved to dismiss the suit for lack of personal jurisdiction and the plaintiff appealed to the Eighth Circuit. Id. at 818, 819. The Eighth Circuit affirmed the dismissal. Regarding the choice-of-law provision, the Court noted that such provisions alone are insufficient to confer personal jurisdiction over a non-forum resident. Id. at 821-22 (quoting K-V Pharm., 648 F.3d at 594). The Court further explained that, although the forum plaintiff felt the effects of the alleged breach, it did not mean that an Iowa court enjoyed "jurisdiction over the non-resident defendant consistent with due process. We simply cannot evince an intent to do business in Iowa on the part of [the defendant] from this choice-of-law provision." Id. at 822.

Additionally, the Court considered the performance terms of the parties' agreement. In Fastpath, the agreement did not specifically require performance in the forum, and was "silent as to where the contemplated sharing of information was to take place." Id. The Court's inquiry focused on the defendant's contacts with the forum, not the plaintiff's. Id. at 822-23. The defendant had "no employees or offices in Iowa, never travelled to Iowa for [the] Agreement, and allegedly breached the covenant outside of Iowa. That an Iowa company felt its breach does not mean that an Iowa court has jurisdiction over the non-resident defendant consistent with due process." Id. at 822. The fact that the defendant arguably pursued the relationship with the

plaintiff was not sufficient either because the "'minimum contacts analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.'"   Id. at 823 (quoting Walden, 134 S. Ct. at 1122).

Ultimately, despite the fact that the defendant initiated contact with the plaintiff, had various communications with the plaintiff in the forum, and the agreement included an Iowa choice-of-law provision, the Court held that the exercise of personal jurisdiction would not comport with due process.   Id. at 819, 825.

### 3. Digi-Tel Holdings, Inc. v. Proteq Telecom., Ltd., 89 F.3d 519 (8th Cir. 1996)

In Digi-Tel Holdings, the Eighth Circuit addressed a situation with several similarities to the present case.   In that case, a Minnesota business contracted with a Singapore company for the purchase of cellular telephones.   The agreement included a choice-of-law provision requiring that the agreement be governed by Minnesota law, but that the purchaser would take delivery of the phones in Singapore.   See id. at 521.   "The parties exchanged dozens of letters and faxes and numerous phone calls in connection with the sales agreement."   Id.   There were also seven face-to-face meetings between the parties, all of which occurred in Singapore.   See id. The parent of the Singapore company applied to register its trademark in Minnesota, and then mailed the trademark certificate to the Minnesota company, as well as several sample cellular telephones bearing the mark.   See id.   The Singapore company failed to deliver the phones as required in the contract and a lawsuit ensued.

The district court dismissed the suit for lack of personal jurisdiction and the Eighth Circuit affirmed.   In so doing, the Court declined to give substantial weight to the choice-of-law provision.   Id. at 523.   Despite the fact that the parties had exchanged substantial correspondence in connection with the agreement, the Eighth Circuit concluded that such

evidence was insufficient to confer personal jurisdiction. Id. The Court described the relevance of the defendant's shipment of samples to the forum as minimal, explaining that "[t]he shipment of the samples into the forum represents a 'casual' or 'fortuitous' contact rather than a significant contact with the forum." Id. (citing cases).

### 4. Viasystems, Inc. v. EBM-Pabst St. Georgen Gmbh & Co., KG, 646 F.3d 589 (8th Cir. 2011)

In Viasystems, a Missouri company entered into an agreement with a German company wherein the Missouri company purchased cooling fans manufactured in Germany, which were shipped to China for use in mobile phone equipment that was to be sold in Japan, not the United States. Viasystems, Inc., 646 F.3d at 592. The German company sent several e-mails and made phone calls to Missouri, and also sent some payments to Missouri. Id. at 593. After some of the cooling fans reportedly malfunctioned, Viasystems, the Missouri company, sued St. Georgen, the German company, in the Eastern District of Missouri. Id. at 592. This District Court granted St. Georgan's motion to dismiss for lack of personal jurisdiction, and the Eighth Circuit affirmed. Id. Viasystems alleged that St. Georgen's conduct amounted to tortious interference with Viasystems' contract with the phone manufacturer, and that the effects of that tort were felt in Missouri. Id. at 593.

The Eighth Circuit concluded that "St. Georgen's incidental contacts with Missouri—scattered e-mails, phone calls, and a wire-transfer of money to Viasystems in Missouri—do not constitute a 'deliberate' and 'substantial connection' with the state such that St. Georgen could 'reasonably anticipate being haled into court there.'" Id. at 594 (quoting Burger King, 471 U.S. 474-75). The Court further explained that such "isolated connections are just the sort of random, fortuitous, and attenuated contacts that cannot justify the exercise of personal jurisdiction." Id. (citing cases and noting that, in Burlington Indus. V. Maples Indus., 97 F.3d

1100, 103 (8th Cir. 1996), the Court held that "100 telephone calls by defendant to plaintiff were 'insufficient alone, to confer personal jurisdiction'").

5.    <b><u>Dairy Farmers of America, Inc. v. Bassett & Walker Int'l, Inc.</u>, 702 F.3d 472 (8th Cir. 2012)</b>

In <u>Dairy Farmers</u>, the plaintiff had its offices in Missouri and the defendant was "an international commodities broker … [with] its principal place of business in [Canada]." 702 F.3d at 474. The parties in that case began their relationship in 2006. "Between July 2009 and February 2011, [the defendant] purchased more than 3.5 million pounds of dairy products from [the plaintiff] in about 80 transactions totaling $5 million." <u>Id.</u> Each transaction was separate and conducted by telephone. <u>Id.</u> The defendant "communicated by phone and email with [the plaintiff's] Missouri headquarters regarding delivery and billing." <u>Id.</u> In 2009, the defendant received a $50,000 line of credit from the plaintiff, and twice sought increases of the line of credit, including up to $400,000. The defendant sent the requests to the plaintiff in Missouri. <u>Id.</u>

With respect to the lawsuit, in March 2011, the defendant used its line of credit to purchase 220,000 pounds of dry milk. The defendant confirmed the agreement by sending an e-mail to the plaintiff's Missouri headquarters. "The agreement called for shipment of the product from Colorado to Mexico; [the plaintiff] manufactured no products in Missouri. The agreement … called for [the defendant] to remit payment to Illinois." <u>Id.</u> After the defendant failed to pay, the plaintiff sued in Missouri. The district court dismissed the action for lack of personal jurisdiction, and the Eighth Circuit affirmed. <u>Id.</u>

The Court concluded that the defendant had not transacted business in Missouri for purposes of the long-arm statute, despite the defendant's frequent communications with the plaintiff's offices in Missouri via phone, e-mail, and facsimile. <u>Id.</u> at 476-77. The Court

further held that, even if the defendant had transacted business in Missouri, "the district court could not constitutionally exercise jurisdiction over [the defendant]." Id. at 477. The Court found that "the nature and quality of [the defendant's] contacts with Missouri do not support jurisdiction under the Due Process Clause." Id. at 478 (citing Aaron Ferer & Sons Co. v. Atlas Scrap Iron & Metal Co., 558 F.2d 450, 455 (8th Cir. 1977)).

      **6.**     **K-V Pharmaceutical Co. v. J. Uriach & CIA, S.A., 648 F.3d 588 (8th Cir. 2011)**

Cepia's arguments in favor of jurisdiction rely heavily on K-V Pharm.[5] That case, however, is factually distinguishable from the present case in several respects. In K-V Pharm., the Eighth Circuit held a non-forum defendant had sufficient minimum contacts with Missouri to support the exercise of personal jurisdiction. K-V Pharm., like the present dispute, involved an agreement between a Missouri plaintiff and a foreign (Spanish) defendant, and the agreement included a Missouri choice-of-law provision. The case is factually distinguishable in several important respects from the present dispute between Cepia and UPVP.

In K-V Pharm., for example, the parties had a long-term contractual relationship, spanning more than ten years, that included renegotiations. See 648 F.3d at 593. Moreover, unlike the present case, in K-V Pharm., a representative of the non-forum defendant came to Missouri to meet with the plaintiff. Id. Additionally, the non-forum defendant shipped product (an antifungal agent) to Missouri so that the plaintiff could then make a cream and sell it. Id. at 594.

---

[5] Realizing the parties' interactions were at a distance from Missouri, Cepia also relies on Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F.Supp 1119 (W.D. Pa. 1997). Zippo is not particularly apt. Zippo focused on the more specific question of whether and when "a website could provide sufficient contacts for specific personal jurisdiction." Johnson v. Arden, 614 F.3d 785, 796 (8th Cir. 2010). The undersigned believes the traditional standards for assessing jurisdiction are better suited for resolving the present motion.

In finding personal jurisdiction existed over the foreign defendant, the Eighth Circuit distinguished its prior decisions in <u>Digi-Tel Holdings</u> and <u>Viasystems</u>.  The Court noted that, in <u>Digi-Tel Holdings</u>, "the negotiations, meetings, production, and delivery were all centered in Singapore."  <u>Id.</u> at 595 (citing <u>Digi-Tel Holdings</u>, 89 F.3d at 523).  Further, "no shipment of actual product came into Minnesota.  The only domestic element of the agreement related to the interpretation of the contract under Minnesota law."  <u>Id.</u>[6]  Similarly, in <u>Viasystems</u>, none of the products at issue were shipped to or sold in the United States, and the defendant never met, face-to-face, with the plaintiff in the forum.

In <u>K-V Pharm.</u>, on the other hand, there was long-term contract that required a continuing relationship with the forum, the defendant traveled to the forum to meet with the plaintiff, and the contract terms required the defendant to ship product to the forum.  <u>See id.</u> at 595-96.

## B.    Application of Primary Factors

When the facts and circumstances regarding the present lawsuit are compared with the foregoing decisions from the Eighth Circuit, the undersigned is left with a firm conclusion that the exercise of personal jurisdiction over UPVP would not comport with due process.  With respect to Cepia's contract-based claims, the nature, quality, and quantity of UPVP's contacts with Missouri are not substantial, and the fact that Cepia may have felt the alleged breach in Missouri is not determinative.  <u>See</u> <u>Fastpath</u>, 760 F.3d at 819, 822.

Likewise, "[a] contract between a plaintiff and an out-of-state defendant is not sufficient in and of itself to establish personal jurisdiction over the defendant in the plaintiff's forum state." <u>K-V Pharm.</u>, 648 F.3d at 593.  The Supreme Court "long ago rejected the notion that personal jurisdiction might turn on 'mechanical' tests … or on 'conceptualistic ... theories of the place of

---

[6] Thus, in <u>Digi-Tel Holdings</u> like the present case, only samples, not actual products for sale, were sent to the forum.  <u>See</u> <u>Digi-Tel Holdings</u>, 89 F.3d at 521.

contracting or of performance.'" Burger King, 471 U.S. at 478 (citations omitted). See also

K-V Pharm., 647 F.3d at 593. "Instead courts should consider the terms of a contract and its

contemplated future consequences in determining whether personal jurisdiction over a

non-resident defendant exists." Fastpath, 760 F.3d at 821 (citing K-V Pharm., 648 F.3d at 594).

Further, simply knowing that Cepia was a Missouri corporation does not create minimum

contacts because "'the plaintiff cannot be the only link between the defendant and the forum.'"

Id. at 823 (quoting Walden, 134 S. Ct. at 1125). The "'minimum contacts' analysis looks to the

defendant's contacts with the forum State itself, not the defendant's contacts with persons who

reside there." Walden, 134 S. Ct. at 1122. Thus, Cepia has failed to meet its burden of proof

with regard to the nature and quality of these communications for the Court to exercise personal

jurisdiction.

With respect to Cepia's tort/conversion claim, it cannot show that UPVP's extraterritorial

tortious acts "were uniquely or expressly aimed at the forum state." Viasystems, 646 F.3d at

594. Therefore, Cepia cannot assert personal jurisdiction on the basis of UPVP's alleged

conversion of its movie rights.

### 1. Factors One and Two – Nature, Quality, and Quantity of UPVP's Contacts with Missouri

Like the defendants in the cases discussed above, UPVP had no employees, agents,

offices, or property in Missouri. See Dairy Farmers, 702 F.3d at 474; Digi-Tel Holdings, 89

F.3d at 521; Scullin Steel, 676 F.2d at 312. Moreover, Cepia initiated the relationship and all

face-to-face meetings occurred in England; there were no face-to-face meetings in Missouri.

Compare Digi-Tel Holdings, 89 F.3d at 521 (all face-to-face meetings were in Singapore);

Scullin Steel, 676 F.2d at 312 (all negotiations were in Pennsylvania, not Missouri); with K-V

Pharm., 648 F.3d at 593 (defendant proposed a meeting in Missouri and travelled to Missouri to

re-negotiate the contract).   Although the parties included a Missouri choice-of-law provision in the Agreement, the cases demonstrate that such a provision does not confer personal jurisdiction over a non-forum defendant.   See Fastpath, 760 F.3d at 821; K-V Pharm., 648 F.3d at 594; Digi-Tel Holdings, 89 F.3d at 523.

It cannot be disputed that the Agreement between Cepia and UPVP focused on activities and efforts which the parties intended to occur outside of the United States.   UPVP executed the Agreement in England after Cepia representatives visited UPVP in England.   Furthermore, the Agreement did not specifically require performance or contemplate future consequences in Missouri.   See Fastpath, 760 F.3d at 822.   In contrast, the Agreement did specifically identify territorial distribution obligations for UPVP which were located entirely outside of the United States.   See Digi-Tel Holdings, 89 F.3d at 523.   Other than the choice-of-law provision, the Agreement does not mention any connection with Missouri.   (ECF No. 1-1)

UPVP's other contacts with Cepia in Missouri consisted primarily of periodic e-mails, phone calls, and similar communications.   These are the type of attenuated contacts that the Eighth Circuit has routinely found insufficient to satisfy the Due Process minimum contacts standard.   See, e.g., Viasystems, 646 F.3d at 594 (explaining that "scattered e-mails, phone calls, and a wire-transfer of money to [the plaintiff] in Missouri … do not constitute a 'deliberate' and 'substantial connection' with the [forum] state").[7]   See also Digi-Tel Holdings, 89 F.3d at 523. Although UPVP transferred funds to Cepia, the money transfers reflected payments for money earned by Cepia outside of Missouri from the international distribution of Cepia's two Movies. Further, and as indicated above, the transfer of funds to the plaintiff does not necessarily confer

---

[7] In Viasystems, the Court also noted that it had previously held that "100 calls by defendant to plaintiff were 'insufficient alone, to confer personal jurisdiction.'"   Id. at 594 (quoting Burlington Indus. V. Maples Indus., 97 F.3d 1100, 1103 (8th Cir. 1996).

personal jurisdiction over a non-resident defendant.   See Dairy Farmers, 702 F.3d at 479;

Viasystems, 646 F.3d at 595.

Unlike the situation in K-V Pharm., the Agreement between Cepia and UPVP was short-term in duration; it was not re-negotiated and no UPVP personnel traveled to Missouri in connection with negotiating or performing the Agreement.   In K-V Pharm., the parties' relationship spanned more than ten years, and included a face-to-face meeting in Missouri initiated by the defendant.   See K-V Pharm., 648 F.3d at 593.   Although UPVP sent products to Cepia in Missouri, those were samples for approval, not products for distribution.   Thus, the present case is much more like Digi-Tel Holdings, where sample phones were sent to the forum, than K-V Pharm., where the defendant sent an antifungal agent the forum for the plaintiff to use in making and selling a cream.   Compare Digi-Tel Holdings, 89 F.3d 523 (explaining that, although the shipment of samples to the forum has relevance, "its effect is minimal"); with K-V Pharm., 648 F.3d at 594 (noting the existence of a delivery term in the contract that requires delivery to the plaintiff in the forum).

Accordingly, viewing the facts in a favor of Cepia, and in consideration of decisions in similar cases, the first two factors weigh in favor of UPVP.

**2.      Factor Three – Relationship Between Cause of Action and Contacts**

The third factor weighs heavily against a finding of personal jurisdiction in this case. The relationship between Cepia's causes of action to UPVP's contacts with Missouri is attenuated at best.   In this case, UPVP's suit-related conduct occurred outside of the United States and is disconnected from Missouri.   UPVP allegedly distributed one of Cepia's movies – *Amazing Adventures of Zhu* – without Cepia's approval.   In particular, Cepia claims that UPVP distributed the movie to two television broadcasters/networks in Brazil and France.   There is no

allegation that UPVP's distribution of the movie occurred in Missouri or anywhere else in the United States. Cepia alleges, however, that this conduct has devalued the movie and "precluded Cepia from generating revenues from the DVD/Blu-Ray market in both Brazil and France and also in other parts of the world market as well." (ECF No. 1 at ¶ 69) Cepia also alleges that UPVP owes Cepia revenues under the Agreement and that UPVP has refused to pay such revenues.

The fact that Cepia may have felt the harm in Missouri is of little consequence to the Court's due process, minimum contacts analysis. This is true regardless of whether one focuses on Cepia's contract claims or its conversion/tort claim. UPVP's allegedly wrongful conduct—the unauthorized distribution of a movie in Brazil and France—occurred outside of Missouri and indeed outside of the United States. See Fastpath, 760 F.3d at 822 (explaining that simply because an Iowa plaintiff felt the breach "does not mean that an Iowa court has jurisdiction over a non-resident defendant consistent with due process"); Viasystems, 646 F.3d at 594 ("Due process allows a state to assert personal jurisdiction over a defendant based on the in-state effects of defendants' extraterritorial tortious acts only if those acts … were uniquely or expressly aimed at the forum ….") (internal quotations omitted).[8] See also Steinbach, 518 F.3d

---

[8] As the Eighth Circuit recognized in Fastpath, the Supreme Court's decision in Walden v. Fiore, 134 S. Ct. 1125 (2014), is instructive.

> In [Walden], plaintiffs brought a tort action against the defendant Drug Enforcement Administration agent in their home state of Nevada after the agent seized their funds in Atlanta. 134 S. Ct. at 1119-20. The Supreme Court held Nevada lacked personal jurisdiction over the agent, despite his knowledge that plaintiffs were Nevada residents, because none of his activities took place in Nevada. Id. at 1124. "[The agent's] actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at plaintiffs whom he knew had Nevada connections." Id. at 1125.

at 586.   Stated simply, none of UPVP's wrongful conduct was directed at Missouri or even the United States.

Therefore, the third factor weighs against a finding of personal jurisdiction over UPVP in Missouri.

**C.**     **Application of Secondary Factors**

**1.**     **Factor Four - Interests of Missouri in Providing Forum for Residents**

The fourth factor–the interest of Missouri in providing a forum for its residents–weighs in favor of Cepia.   Missouri, no doubt, has an interest in providing a forum to its residents for resolving contractual disputes, as well as tort claims.   This interest alone is insufficient to resolve the jurisdictional question in favor of Cepia.   To conclude otherwise would render the three primary factors irrelevant in most, if not all, cases.

**2.**     **Factor Five – Convenience of the Parties**

The fifth factor–the convenience of the parties–is largely neutral.   A trial in Missouri would inconvenience UPVP as much as a trial elsewhere would inconvenience Cepia.   To the extent the fifth factor is given any weight in the final analysis, it is weighed in favor of UPVP. While UPVP never traveled to Missouri in connection with the Agreement, Cepia initiated the relationship, and several Cepia employees and agents traveled to England to meet with UPVP personnel.   Thus, to the extent this secondary factor influences the minimum contacts analysis, any such influence tilts in favor of UPVP and against a finding of personal jurisdiction in this case.

---

Fastpath, 760 F.3d at 823 (discussing Walden).

<u>**CONCLUSION**</u>

The Court finds that Cepia has not presented sufficient evidence to conclude that UPVP is subject to personal jurisdiction in the Eastern District of Missouri. Although it is questionable whether any of UPVP's conduct would satisfy any of the relevant provisions of the Missouri long-arm statute, Cepia has not shown that UPVP has sufficient minimum contacts with Missouri to permit the exercise of personal jurisdiction consistent with due process notions. Therefore, Defendants' Motion to Dismiss (ECF No. 10) will be granted.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss (ECF No. 10) is **GRANTED**.

A separate Judgment consistent with this Memorandum and Order will issue forthwith.

 /s/ ***John M. Bodenhausen***
JOHN M. BODENHAUSEN
United States Magistrate Judge

Dated this    7th    day of    April   , 2016.